UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF WISCONSIN

------------------------------------------------------------------

UNITED STATES OF AMERICA, )
  )
              Plaintiff, )
  )
    vs. )          Case No. CR 97-98
  )
RANDY YAGER, )          Milwaukee, Wisconsin
  )          March 24, 2016
              Defendant. )          2:00 p.m.

------------------------------------------------------------------

**TRANSCRIPT OF CONTINUED FINAL PRETRIAL CONFERENCE**
**AND CHANGE OF PLEA HEARING**
BEFORE THE HONORABLE J.P. STADTMUELLER
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Government:         Office of the US Attorney
                           By: CAROL KRAFT
                               SCOTT J. CAMPBELL
                               LAURA KWATERSKI
                           517 E Wisconsin Ave - Rm 530
                           Milwaukee, WI 53202
                           Ph: 414-297-1706
                           Fax: 414-297-1738
                           carol.kraft@usdoj.gov
For the Defendant
RANDY YAGER:                 Hurley, Burish & Stanton, S.C.
 (Present)                 By: STEPHEN P. HURLEY
                           P.O. Box 1528
                           Madison, WI 53701-1528
                           Ph: 608-257-0945
                           Fax: 608-257-5764
                           shurley@hbslawfirm.com


U.S. Official Reporter:     JOHN T. SCHINDHELM, RMR, CRR,
Transcript Orders:          WWW.JOHNSCHINDHELM.COM

Proceedings recorded by computerized stenography,
transcript produced by computer aided transcription.



1

P R O C E E D I N G S

**(Called to order of the court at 2:01 p.m.)**

THE CLERK: The Court calls the United States of America vs. Randy M. Yager, Case No. 97-CR-98 for a continued final pretrial conference.

May I have the appearances, please, beginning with the government?

MS. KRAFT: Good afternoon, Your Honor. Carol Kraft, assistant United States attorney, along with Assistant United States Attorney Scott Campbell and Laura Kwaterski are appearing on behalf of the United States this afternoon.

MR. HURLEY: Good afternoon, Your Honor. Mr. Yager appears in person and by counsel Steven Hurley, and paralegal Chevon Kagel.

THE COURT: Thank you. Good afternoon, Mr. Campbell and Ms. Kraft and Ms. Kwaterski, and Mr. Hurley, Ms. Kagel, and good afternoon to you, Mr. Yager.

Since we last convened in the case yesterday, the government has submitted a document for the Court's review and I've had an opportunity to go through it.

And I think it would be appropriate first to have an in camera discussion with counsel for the government. And I'm certainly willing to have Mr. Hurley and his client participate. But before we do that, I'd like to do it with the government first in order that the Court fulfill its obligations under

2

Rule 11 before moving forward.

And I will leave it to counsel. If you wish to have the court reporter present for any or all of the in camera, I'm certainly agreeable to that as well, and we will simply do it in the jury room.

MS. KRAFT: I think that we think it would be appropriate to have a court reporter present so in case there's any questions later about the substance of our discussions. I don't think that the -- that it needs to necessarily be an openly available transcript, but I think it might be wise to have one there.

THE COURT: Well, it will be sealed. But if there be some reason down the road, I think it would be terrific to have a verbatim record of your concerns, any concerns the Court might have, and anything that Mr. Hurley and/or his client would like addressed in camera.

So we will start the process with counsel for the government and the court reporter and myself, and then we will invite Mr. Hurley and his client for some additional conversation.

So we will convene in the jury room.

(Further proceedings conducted under seal in the jury room at 2:05 p.m., until 2:52 p.m.)

\* \* \*

(After in camera discussion, hearing resumed in open court at 2:52 p.m.)

THE COURT: The record should reflect that based upon the Court's questions and the comments of counsel and the comments of Mr. Yager during the in-camera portion of this afternoon's hearing, consistent with the requirements of Rule 11(c)(1)(C), the Court has reviewed the proposed plea agreement, had some frank conversations with counsel for the parties, and I have satisfied myself, both on the basis of the responses together with my review of the historical perspective of this case, having been the presiding judge, which is a little unusual that a judge would be the same judge much less the prosecutors be the same prosecutors who handled the entirety of this case dating back to 1997, 1998, '99, trials in 2000, sentencings in late 2000, the aftermath of appeals and habeas corpuses, and yet after 28 1/2 years it's still the same judge and after more than 15 years as prosecutors, Ms. Kraft and Mr. Campbell remain on the case along with a newly acquired assistant who is substituting I gather not in gender but for Mr. Eric Klumb who was, along with Ms. Kraft, the lead prosecutors back in 2000.

But against the totality of all of that, as I explained in my comments in camera, I think the time has come to bring the entirety of this unfortunate episode in the lives of so many people to an end. And I believe the recommendation of

4

the prosecutors and their supervisors and those in Washington who have an interest in the case, compels the Court to favorably act on the agreed-upon sentence of 15 years custody of the Bureau of Prisons.

And so with that aspect of the case behind us, the Court is now prepared to move forward this afternoon with a formal Rule 11 colloquy with Mr. Yager and, at the same time, I'll allow counsel for Mr. Yager and the government to supplement the Court's questions to the extent that they believe it appropriate.

So against that backdrop and the Court having accepted the proposed plea agreement, we can proceed with the taking of testimony under oath.

Mr. Yager, you may remain at counsel table with Mr. Hurley and I will invite my clerk, Ms. Baumel, to administer the oath.

THE CLERK: Please stand and raise your right hand.

(Defendant sworn.)

EXAMINATION

BY THE COURT:

Q. Mr. Yager, before proceeding with the Court's questions this afternoon, I would like to remind you that you are now under oath. And to the extent that you provide false or untruthful answers to any question put to you by the Court or by Mr. Hurley or Mr. Campbell or Ms. Kraft or Ms. Kwaterski, you may be

subjecting yourself to additional criminal penalties for perjury or lying under oath.  Do you understand that?

A.  Yes, I do.

Q.  Thank you.  Once again for the record, would you state your full name and spell your first and last name for the court reporter.

A.  Randy M. Yager.  R-A-N-D-Y, Y-A-G-E-R.

Q.  And how old are you?

A.  I'm 59 years old.

Q.  And what is your date of birth?

A.  August 7th, 1956.

Q.  And where were you born?

A.  Gary, Indiana.

Q.  And I gather you lived there for the better part of your adult life?

A.  Yes, I did.

Q.  And what is the extent of your formal education including high school?

A.  I took a GED.  And then from the GED I took a college course to get an associate's degree in business.

Q.  And when you were living in Gary, where did you live?

A.  5110 Washington.  It was my mother's residence.

Q.  And have you ever been married?

A.  Yes, I was married twice.

Q.  And do you recall what years?

6

A. I got married in 1975 and got divorced in '83, and then I got remarried in Mexico.

Q. All right. And out of either of those marriages did you have any children?

A. Yes, I did. I have a daughter 40 years old and a son 32.

Q. And where do your children live?

A. The daughter lives in St. Louis, Missouri, and my boy lives in Valparaiso, Indiana.

Q. All right. Prior to the indictment being returned in this case, were you employed?

A. Yes, I was.

Q. And what type of work generally were you involved in?

A. I had a car dealership and I also had a motorcycle and car repair shop.

Q. And those were in Gary?

A. Yes.

Q. And did you have any employees or were these sole proprietorships?

A. Well, I had guys working for me, you know, because I couldn't be at two places at the same time.

Q. All right. And at the time the indictment was returned in this case were those business entities still operating?

A. Yes. Yes, sir.

Q. So you were still repairing cars and motorcycles and selling used ones?

7

A. Yeah. And I had a car lot so I sold used cars.

Q. Yes. How long had you been engaged in that business?

A. Almost all my life. I've been working with my hands building cars and bikes since I was like 11 years old.

Q. All right. Had you had any other employment other than what you've described?

A. I used to work in a steel mill. And they laid me off so that's when I went to working on cars and stuff, because once I got laid off I still had to support a family.

Q. Do you recall ever filing either a state or a federal tax return?

A. Oh, yes, sir. I mean, I did one every year when I was working with the steel mill, and then once I started my businesses I filed taxes every year.

Q. Do you recall the last time you would have filed?

A. It would have been 1997.

Q. Have you ever been hospitalized or treated for mental illness?

A. No, sir.

Q. Have you ever been hospitalized for either drug or alcohol abuse?

A. No, sir.

Q. Are you under the influence of any drug or medication this afternoon?

A. No, sir.

Q. Are you under the influence of any alcoholic beverage of any kind?

A. No, sir.

Q. Now, during the in-camera portion of this proceeding this afternoon you had disclosed that you're currently taking medication for high blood pressure; correct?

A. Yes, sir.

Q. And I gather you took that medication today?

A. I took it this morning, yeah.

Q. All right. Do you recall how often you're called upon to take that medication?

A. Every day.

Q. Do you believe that the medication that you are currently taking for high blood pressure causes you any difficulty in either understanding the Court's questions this afternoon or appropriately responding to those questions?

A. No. No, sir.

Q. Now, as you are aware, Mr. Yager, you were originally charged along with 16 other individuals with offenses involving racketeering and related conduct in violation of federal law all the way back in 1997; correct?

A. Yes, sir.

Q. And shortly after your arrest in the fall of 2014, in the spring of last year a superseding indictment was returned in connection with your case; correct?

A. Yes, sir.

Q. And do you believe that you have had an adequate opportunity to discuss both the original charges as well as the charges embodied in the Superseding Indictment with Mr. Albee, who preceded Mr. Hurley representing you, as well as Mr. Hurley?

A. Yes. Yes, sir.

Q. And are you fully satisfied with Mr. Hurley's representation of you in these matters?

A. Yes, sir.

Q. Is there anything that you have requested of Mr. Hurley in conjunction with his representation of you in these matters that for one reason or another he has not been able to accommodate you on?

A. No, sir.

Q. Now, as you are aware, because we discussed it during the in-camera portion of this afternoon's hearing, you and Mr. Hurley and counsel for the government have reached an agreement to dispose of your case through entry of pleas of guilty to the offenses charged in the two-count indictment; correct?

A. Yes, sir.

Q. My next series of questions will relate to that document, the first of which relates to the signature page which is found on page 15. And my question of you, Mr. Yager, is whether the signature that appears above your printed name is, in fact, your

10

Q. signature?

A. Yes, sir.

Q. Prior to signing this document earlier today, I gather you and Mr. Hurley and counsel for the government have had some long deep conversations about what went into the final agreement; is that fair?

A. Yes. Yes, sir.

Q. So today was not the first day you saw most of what is in this document; correct?

A. I seen it yesterday, too.

Q. All right. And do you believe that you understand all of its relevant terms and provisions?

A. Yes, sir.

Q. Did anyone threaten you or coerce you in any way or promise you anything beyond what's disclosed in the document itself in order to get you to sign the document?

A. No, sir.

Q. Now, you are aware that this is a rather unique disposition of the case because it's one of those rare situations in which the Court, as part of the disposition of your case, before we commenced this open-court hearing, that I agreed, after discussing all of the relevant facts with both counsel for the government and you and your attorney, that I agreed to the disposition that is contained in the recitals in the plea agreement. You understand all of that?

A. Yes, sir.

Q. And you know what that disposition is, namely, a term of imprisonment of 15 years to be followed by a term of supervised release. You understand that?

A. Yes, sir.

Q. And that's a disposition that is considerably below what might otherwise have been the disposition in your case but for this agreement on the front end. Do you understand that?

A. Yes, sir.

Q. Since you're very much aware of the fact that sentences of other defendants in this case, dating back to the year 2000 or 1999, ranged from 36 months imprisonment to life imprisonment. Do you understand that?

A. Yes, sir.

Q. And as we discussed in the closed portion of the hearing, sentencing in any case is a combination of the relevant conduct together with the characteristics of the individual offender and hopefully to arrive at a fair, just and reasonable sentence that is one that is sufficient but not greater than necessary to achieve the goals of sentencing. Do you understand that?

A. Yes, sir.

Q. And in your case the Court, with the recommendations of counsel for the government, has agreed, prior to the receipt of the presentence report, to what has been agreed upon between you and your attorney and the government for a sentence of 15 years.

Do you understand that?

A. Yes, sir.

Q. And do you also understand that, in part, the uniqueness of your situation, the uniqueness of where we are in terms of a timeline with regard to the disposition of your case, namely, about 16 or 17 years after all of the other defendants' cases were adjudicated and the defendants sentenced, coupled with the fact that although you were not present here in the United States, effectively you were, I guess for lack of a better description, in a state of exile because you were living essentially underground dealing with the medical conditions that we have been discussing in the closed portion of the hearing, together with some of the limited work that you were able to do in Mexico. You understand all of that?

A. Yes, sir.

Q. And that played a role in the Court's determination on the front end as to what an appropriate sentence ought to be. You understand that as well?

A. Yes, sir.

Q. And you appreciate the fact that it was those sorts of considerations that the Court took into account in agreeing to a sentence ultimately of not more than 15 years. Do you understand that?

A. Yes, sir.

Q. And do you also understand that the Court recommended that

Case 2:97-cr-00098-JPS    Filed 06/02/22    Page 13 of 27    Document 2288

as part of the presentence process that you have a very in-depth medical evaluation so that the Court have as part of its sentencing material an up-to-date accurate medical evaluation beyond the symptomology that you described in our discussion. Do you understand that as well?

A. Yes, sir.

Q. Now, other than the agreed-upon sentence, do you also understand that had you gone to trial in this case you may have been subject to as long as a life sentence on either or both of the offenses charged in the Superseding Indictment?

A. Yes, sir.

Q. Do you understand that?

A. Yes, sir, I do.

Q. And you also understand that any sentence to be imposed by the Court would also be subject to a term of supervised release; correct?

A. Yes, sir.

Q. And you also understand that quite apart from any formal sentence, that each of the counts of conviction would be considered felonies under federal law because they carry a term of imprisonment that is greater or longer than 12 calendar months. Do you understand that as well?

A. Yes, sir.

Q. Do you have any question at all about any of the matters that we've covered so far?

A.   No, sir.

Q.   Now, by pleading guilty to the offenses charged in Counts 1 and 2 of the Superseding Indictment, you are being called upon this afternoon to waive or give up a number of rights that you have as a defendant in a criminal case.  And for the most part they are described in the numbered paragraphs of the plea agreement, but I would like to take a few minutes to discuss them with you here in open court.

As you are aware, Mr. Yager, you are entitled to proceed to trial; however, if I accept your pleas of guilty this afternoon there will not be a trial.  You understand that?

A.   Yes, sir.

Q.   And under the law, if I accept your pleas of guilty, you are called upon today to waive or give up that most important of rights in a criminal case and that is the right to enjoy the presumption of innocence which remains with you throughout every stage of this case and would not be overcome until such time, as if ever, the finder of fact, whether it be the Court sitting without a jury or a jury of 12, unanimously found from all of the evidence in the case that you were guilty of one or both of these charges.  Do you understand that?

A.   Yes, sir.

Q.   In addition, as noted in the plea agreement, you are also being called upon to waive or give up your right to a public and speedy trial, as well as your right to a trial by jury; that is,

12 citizens of the district randomly selected whose function it is to determine the facts from the evidence to be presented and, based upon those facts and in accordance with the Court's instructions on the law, render a verdict, whether it be a verdict of guilty or a verdict of not guilty on each count and as to each racketeering act charged in Count 1.

In either event, whether it be a verdict of guilty or a verdict of proven or not proven, the jury's verdict must be unanimous. Do you understand that?

A. Yes, sir.

Q. As reflected in the plea agreement, you are also being called upon this afternoon to waive or give up your right to participate with Mr. Hurley in the selection of a jury to hear the evidence against you; as well as your right, through Mr. Hurley's cross-examination, to confront or test each of the government's witnesses who would give their testimony against you here in this very courtroom beginning on Tuesday, April 5th. Do you understand that as well?

A. Yes, sir.

Q. You are also being called upon today to waive or give up your right to take the witness stand in your own defense, as well as your right to call upon the subpoena power of the court to summon witnesses to give testimony as part of any defense that you may wish to offer the factfinder.

Now, in reference to these latter two rights, it's

important to keep in mind that this is a criminal case and there are three important rules about criminal cases that one always need keep in mind:

First, the burden of proof rests with the government; it never shifts to Randy Yager as the defendant.

More importantly, under our Constitution you have the absolute right to remain silent, and the fact that you might elect not to testify or may elect not to call any witnesses or present any evidence may not even be considered by the factfinder in addressing the ultimate question of whether you were guilty or not guilty of either of the offenses charged in the Superseding Indictment.

Do you understand that as well?

A.   Yes, sir.

Q.   Finally, in a criminal case the government's proof must meet a standard known as *proof beyond a reasonable doubt.*  Do you understand that as well?

A.   Yes, sir.

Q.   Now, all of that said, it does remain that you both have the right to testify as well as the right to call witnesses and present evidence; however, should the Court accept your pleas of guilty this afternoon, there will be no trial and thus no opportunity, at least insofar as the guilt phase of the case is concerned, for you to testify or call witnesses or present evidence.  Do you understand all of that?

A. Yes, sir.

Q. And knowing that you are being called upon to give up or waive each of these rights as I have discussed them with you and as they have been memorialized in the written plea agreement, does it still remain your desire to enter pleas of guilty to each of these offenses?

A. Yes, sir.

Q. Thank you. In addition, Mr. Yager, I would be remiss if I did not also draw your attention to the fact that certain of your civil rights are going to be adversely affected as a consequence of a conviction for a felony. And although my list this afternoon is not meant to be all-inclusive, it is meant by way of several examples to demonstrate to you circumstances affecting your civil rights.

For example, to the extent that you either remain incarcerated or otherwise subject to an undischarged term of supervised release for felony conduct, you may not cast a vote in any election.

In addition, as a result of a felony conviction you may not own or possess a gun or a firearm or any ammunition.

In addition, you may find yourself ineligible to either hold public office or to serve as a member of a jury.

Finally, certain employment occupations, particularly those occupations that might require a special license of one sort or another, or might otherwise involve a position of trust,

may be foreclosed to you again as a result of a felony conviction. Do you understand that as well?

A. Yes, sir.

Q. And, again, appreciating the fact that these and perhaps other of your civil rights may be adversely affected, does it still remain your desire to enter a plea of guilty to each of these offenses?

A. Yes, sir.

Q. Do you wish that I read each of these charges to you this afternoon or do you believe that you sufficiently have them in mind in order to enter a plea of guilty?

A. I read them already, Your Honor.

Q. All right, thank you.

Next I would like to briefly address with you, Mr. Yager, what the government would be prepared to prove if your case came to trial. And as we discussed in the closed portion of the hearing, that information has been delineated in paragraphs 5-A through F, inclusive -- actually it's through A through I, inclusive, on pages 2, 3 and 4 of the plea agreement.

And my question of you in reference to that information, Mr. Yager, based upon your review of the material and based upon your review of the discovery in the case and your discussions with your counsel, do you believe that that summary as detailed in paragraph 5 on pages 2, 3 and 4 of the plea agreement is substantially true and correct to the best of your

knowledge?

A.  Yes, sir.

Q.  Thank you.

THE COURT:  Mr. Hurley, beyond the comments that we had in the closed portion of the hearing, are you able to state that there are any reasons that the Court ought not accept your client's proposed pleas of guilty to the conduct charged in Counts 1 and 2 of the Superseding Indictment?

MR. HURLEY:  I know of no reasons, Your Honor.

THE COURT:  Are there any additional questions that you would like to put to Mr. Yager this afternoon?

MR. HURLEY:  No, sir.

THE COURT:  Thank you.

Ms. Kraft, Mr. Campbell or Ms. Kwaterski, do either or any of you have any additional questions of Mr. Yager?

MS. KRAFT:  No, Your Honor.  Not at this time.

THE COURT:  Thank you.

That being the case, Mr. Yager, I'm not going to take the time to reread in their entirety each of the charges embodied in Counts 1 and 2 of the Superseding Indictment, but I am obliged to ask you how you plead to Count 1 which charges a series of racketeering acts, numbering eight in number, as part of an overall --

THE DEFENDANT:  Guilty.

THE COURT:  -- engagement to engage in racketeering

Case 2:97-cr-00098-JPS   Filed 06/02/22   Page 20 of 27   Document 2288

acts that constitute violations of Title 18 of the U.S. Code, Section 1962(c)?  How do you plead to that conduct?

THE DEFENDANT:  Guilty.

THE COURT:  And similarly, how do you plead to the conspiracy count which charges you with having engaged in conduct constituting a conspiracy to violate Title 18, Section 1962(d)?

THE DEFENDANT:  Guilty.

THE COURT:  And all of this, of course, occurred during the relevant time period charged in the indictment as to both counts from the period beginning in January of 1990, through the return of the original indictment in June of 1997. Do you understand that and that's the relevant period that we're talking about?

THE DEFENDANT:  Yes, sir.

THE COURT:  And we're not talking about the time you spent in Mexico following the return of the indictment until you were apprehended.  Do you understand that?

THE DEFENDANT:  Yes, sir.

THE COURT:  How did you happen to learn that the indictment was returned?  Did you learn about it through the media or did a family member contact you and say you might be one of the individuals named?  Do you have any recollection as to how that might have occurred?

THE DEFENDANT:  Yes, I do.  Ron Holmes stopped me and

told me that I should go on vacation.

THE COURT: Very well.

Well, against the backdrop of the terms of the plea agreement, the discussions that the Court had with counsel in the closed portion of the hearing, based upon my review of the terms of the plea agreement including the elements of each of the respective offenses charged as those elements are laid out in paragraphs 8 and 9 on page 5 of the plea agreement, together with Mr. Yager's responses to the Court's questions here in open court, lead the Court to conclude first that he is fully competent and capable of entering an informed plea as to each offense, and that his pleas of guilty are both knowing and voluntary pleas supported by an independent basis in fact, supported by the summary of the evidence embodied in paragraph number 5 on pages 2, 3 and 4 of the plea agreement, and those facts address each of the essential elements of the respective offenses; namely, violations of Title 18, Section 1962(c) and Title 18, Section 1962(d).

Accordingly, the Court does herewith accept Mr. Yager's pleas of guilty, and I do now formally adjudicate him guilty of violations of Title 18, Section 1962(c) and 1962(d).

Having made each of those findings, Mr. Yager, I'm going to direct that the probation department complete a presentence investigative report. And beyond the matter of what

22

ought to ultimately be an appropriate sentence in your case, as I suggested to Mr. Hurley during the closed portion of the hearing, that you undergo a complete thorough medical examination. Whether that's conducted here locally or at the Federal Medical Center either in Springfield or in Minnesota, I'm going to leave that to you and Mr. Hurley and counsel for the government to address since I believe it is most importantly in your interests that you have a complete medical evaluation against the backdrop of what occurred in Mexico and your current medical needs.

I suggested during the closed portion of the hearing that sentencing in this case be put off until later in the summer, perhaps July or even as late as September. And I'm not going to order a definitive disclosure date for the presentence report this afternoon. There is no one here from the probation department. And while I'm sure that we can address the concerns that the Court expressed in a timely way, I think it would be wise for everyone to take a step back and get a handle on the medical issues that exist here and so that everyone is much better informed as to Mr. Yager's medical needs.

And so, Mr. Hurley, I'm going to ask that you, following this hearing, whether today or next week, contact the probation department to schedule an initial interview along the lines that the Court and counsel reached an accord on during the closed portion of the hearing and then follow up with the

23

medical issues.

And I would ask that not later than May 15th you provide the Court with a timeline to complete the presentence report and a medical evaluation so that at least we can have some foresight as to scheduling a sentencing hearing.

MR. HURLEY:  Yes, sir.

THE COURT:  Mr. Yager, under the law you're entitled to have Mr. Hurley present during any contact with the probation officer assigned to prepare your presentence report.  So you and Mr. Hurley need to confer about that and let the probation department know of your desire to have Mr. Hurley present.

THE DEFENDANT:  Yes, sir.

THE COURT:  Are there any other matters that we can address this afternoon?

MS. KRAFT:  Not from the government, Your Honor.

MR. HURLEY:  Nor from the defense, Your Honor.

MR. FROHLING:  Your Honor, can I speak with Mr. Campbell for a second?

THE COURT:  Certainly.

(Government counsel confer.)

MS. KRAFT:  Mr. Campbell was informed by Mr. Frohling that in a Rule 11 in this type of a hearing the appeal waiver needs to be addressed on the record at this time.  Usually that happens at the sentencing, doesn't it?

THE COURT:  Well, we can put something on the record.

24

By virtue of an agreed sentence, Mr. Yager, as the parties contemplated, there will not be any appeal of the sentence since it's agreed upon on the front end.  Do you understand that?

THE DEFENDANT:  Yes, sir.

MR. HURLEY:  I think to be precise, Your Honor, the way that the waiver has been worded in the plea agreement, it does reserve the right to appeal or to seek postconviction remedies based on ineffective assistance of counsel.

MS. KRAFT:  And that alone.

MR. HURLEY:  And that alone, correct.

THE COURT:  Well, I didn't comment on it earlier, not that Mr. Albee was not a good lawyer, he's among the best, but I'm here to tell you, Mr. Yager, all things considered, you could not have a better lawyer than Stephen Hurley.  And likewise, the government is well represented in this case.

And there is more than a small part of Judge Stadtmueller who would have thoroughly enjoyed trying this case. But as I explained in the closed portion of the hearing, we only have three judges handling criminal cases currently and our calendars are rather choked because both Judge Randa and Judge Clevert no longer take criminal cases.  And although Judge Randa is expected at some point to return to assume his judicial work in civil cases, we haven't reached that point.  And he did elect senior status as of February 5th, and as near as anyone can tell

Case 2:97-cr-00098-JPS   Filed 06/02/22   Page 25 of 27   Document 2288

there isn't going to be any activity on a replacement until probably after the November election. And so we're very busy.

But, that said, I would have certainly enjoyed trying the case. But as I also explained during the closed portion of the hearing, the times they have changed, sentencing guidelines are no longer mandatory, priorities of law enforcement are a lot different today than they were in the '90s. You are a different person today than you were in the '90s. And at the end of the day, the time has come to bring this case to an end.

And every case is different. And we've all learned an awful lot over the last I guess soon to be 20 years of dealing with it. And it's very unique that the same team of prosecutors, same judge is on the same case.

But all of that said, the time has come to bring closure to it and at least provide you with a ray of light at the end of the tunnel.

THE DEFENDANT: Thank you, Your Honor.

THE COURT: The Court stands in recess.

(Proceedings concluded at 3:32 p.m.)

\*    \*    \*

26

C E R T I F I C A T E

I, JOHN T. SCHINDHELM, RMR, CRR, Official Court Reporter for the United States District Court for the Eastern District of Wisconsin, do hereby certify that the foregoing pages are a true and accurate transcription of my original machine shorthand notes taken in the aforementioned matter to the best of my skill and ability.

Signed and Certified June 2, 2022.

/s/John T. Schindhelm

John T. Schindhelm

John T. Schindhelm, RPR, RMR, CRR
Retired United States Official Reporter

Website: WWW.JOHNSCHINDHELM.COM