UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WISCONSIN

------------------------------------------------------------------

UNITED STATES OF AMERICA,

                    Plaintiff,

        -vs-                        CASE NO.:  97-CR-98

RANDY M. YAGER,

                    Defendant.

------------------------------------------------------------------

              SENTENCING hearing in the above-entitled matter,

held before the Honorable J.P. Stadtmueller, on the 26th day of

July, 2016, commencing at 8:31 a.m. and concluding at 9:05 a.m.


A P P E A R A N C E S

United State Department of Justice
Office of the U.S. Attorney
Ms. Carol L. Kraft and Ms. Laura Kwaterski
517 East Wisconsin Avenue, Room 530
Milwaukee, Wisconsin  53202
Appeared on behalf of the Plaintiff.

Hurley Burish, S.C., by
Mr. Stephen P. Hurley
33 East Main Street, Suite 400
Madison, Wisconsin  53701
Appeared on behalf of the Defendant, also present.


Mr. Daniel D. Dragolovich, U.S. Probation Office.
Ms. Carla Baumel, Clerk.
Ms. Sheryl L. Stawski, Official Reporter.

T R A N S C R I P T   O F   P R O C E E D I N G S

(The proceedings commenced at 8:31 a.m.)

THE CLERK:  The Court calls the United States of America versus Randy M. Yager, Case No. 97-CR-98, for the imposition of sentence.

May I have the appearances.

MS. KRAFT:  Good morning, Your Honor.

Carol Kraft and Laura Kwaterski, Assistant United States Attorneys, appear on behalf of the United States.

With us at counsel table this morning is Special Agent Sandra DeValkenaere with the Bureau of Alcohol, Tobacco, Firearms and Explosives.

MR. HURLEY:  Good morning, Your Honor.

Steven Hurley along with Paralegal Shavonne Kegel (phonetic) on behalf of Mr. Yager, who's present in person.

MR. DRAGOLOVICH:  Good morning.

Daniel Dragolovich, U.S. Probation.

THE COURT:  Thank you.

Good morning to Counsel; and good morning to, Ms. DeValkenaere; good morning to you, Mr. Dragolovich; and good morning to you, Mr. Yager.

For some reason, at least on the bench, our sound system is not working this morning, but I think everybody can hear me.

Randy Yager, back on May 24th of this year, you

entered a plea of guilty and were adjudged guilty as to both Counts One and Two of the Second Superseding Indictment charging you with participation in an enterprise engaged in racketeering activity in violation of Title 18 of U.S. Code Section 1962.

Count Two charges a similar violation contrary to Title 18 Section 1962(d).

We have now reached that stage of these proceedings where it becomes the duty of the Court to address several questions to both you and counsel.

First of all, Mr. Yager, have you had sufficient opportunity to review the revised presentence report prepared in your case under date of July 25th of this year together with the short addendum bearing the same date?

THE DEFENDANT: Yes, sir.

THE COURT: Thank you.

Similarly, Mr. Hurley, have you had an opportunity to review those documents?

MR. HURLEY: I have, Your Honor.

THE COURT: And are there any facts that have been presented that either you or your client take exception to?

MR. HURLEY: I have written a letter of clarification for the Court.

THE COURT: I understand.

But as to the facts, I think most of your concerns

address the, I guess for purposes of this proceeding, academic question of --

MR. HURLEY: Yes.

THE COURT: -- the sentencing guidelines.

MR. HURLEY: Yes, those are the only exceptions that I took, Your Honor.

THE COURT: And I understand.

Ms. Kraft, do you or your colleague have any objections as to any of the facts?

MS. KRAFT: No, Your Honor.

We believe the facts are accurately stated, and we stand by them.

THE COURT: Very well.

That being the case and the Court having no independent basis to disagree with or otherwise challenge any of the facts as delineated in the numbered paragraphs of the July 25th revised presentence report, I do herewith adopt all of those facts and will rely on them, first, in determining the advisory sentencing guidelines applicable in Mr. Yager's case together with the terms of the ultimate sentence.

Now, as to the advisory sentencing guidelines, the Probation Department has submitted the following metric:

It includes a total offense level of 43; a criminal history category of Roman numeral six which, consistent with the guidelines, carries a life term of imprisonment followed by

a two-year but not more than five-year period of supervised release; a fine of not less than $25,000 nor no more than $250,000; and, finally, a $100 special assessment on each count or a total special assessment of $200.

Mr. Hurly, I appreciate the concerns you earlier raised with regard to acceptance of responsibility credit on the guidelines; but as everyone acknowledges, it won't change the term of imprisonment under the guidelines.

Now, for the record, given the totality of the facts and circumstances here, I do believe that this is one of those appropriate cases where acceptance of responsibility credit under the sentencing guidelines ought to be credited.

After all, Mr. Yager did not put the Government through a burdensome lengthy trial; and although he absconded for a period of time, that in no manner and by no means, other than his own situation, obstructed justice because, ultimately, he was apprehended, prosecuted, the co-defendants who elected to proceed to trial did so and were all convicted.

So I have no reason on the state of the record in Mr. Yager's case to add additional points for obstruction of justice.

And, again, without consideration of those matters, the sentence at least under the guidelines remains the same.

MS. KRAFT: Just so I am clear, he did get the obstruction points, but he also got acceptance points, right?

Under the obstruction that Mr. Dragolovich figured, those for pleading were applied; but then we agreed that he should get points -- the decrease for acceptance of responsibility, and that's what the Court is saying; is that correct?

THE COURT: What I'm saying is he gets credit for both under the guidelines.

In other words, there is no increase for obstruction of justice, and there is acceptance of responsibility credit.

It doesn't change the metric in terms of the term of imprisonment.

MS. KRAFT: Okay.

THE COURT: Mr. Hurley, do you concur in the Court's findings?

MR. HURLEY: Yes, sir.

THE COURT: And Ms. Kraft?

MS. KRAFT: Well, I accept them. How is that?

THE COURT: That's fine.

Just as I, as the judicial officer, accepted the parties' joint recommendation for a specific sentence, that's all part of the process of determining what is fair, what is just, what is reasonable, what is sufficient but not greater than necessary to achieve that which everyone who is part of the criminal justice system, whether you're a prosecutor or a judge or a probation officer or a defense attorney, ultimately our goal is the same; fairness and justice.

And I dare say while there have been many, many entreaties with respect to taking a very, very hard look at the sentencing guidelines, fortunately these cases that date back to the 1990s are few and far between in this century; and as a consequence, they're not getting the attention that they perhaps would have had there been many more prosecutions, if only against the backdrop of the horrendous cost associated with these draconian prison terms. And that doesn't begin to address the medical concerns of individuals who are above the age of 70 and incarcerated.

Now, when the sentencing guidelines were first promulgated back in 1984 to take effect November 1st of 1987, the cost per inmate per day was something in the area of 28 to $30. As of the 1st of June, that number is now $87.62.

And as I have repeatedly said, you will not find a single word in either the legislative history or the guidelines themselves that were promulgated following the Sentencing Reform Act that addressed the matter of the cost associated with incarceration. It is nowhere to be discussed.

And, fortunately, there are a few wise individuals, whether they be judges or members of Congress, who are now beginning to focus on this incredible disparity and what we, as a society, are doing with regard to these long, long prison terms.

At the end of the day, we have about 4.8 percent of

the world's population; yet we have over 25 percent of the world's incarcerated defendants are here in these United States at a cost nationwide of billions upon billions and billions.

And if only 10 percent of that money could be appropriated for educational enhancements, whether they be at the high school or college level, it would go a long way, in the view of one judge, to addressing the societal concerns with regard to this continued escalation of criminal conduct principally related to drugs and various forms of fraud.

Now, as to the joint recommendation of the parties, Mr. Hurley, I've reviewed your letter; and I am very much mindful of the comments that were made to the Court back at the time the 11(e) plea agreement was broached with the Court; so to the extent that you and your client have some further comments you would like to make this morning, now is your opportunity.

MR. HURLEY: I have no further comments, Your Honor.

THE DEFENDANT: No, sir.

THE COURT: Ms. Kraft, do you have anything more you'd like to add?

MS. KRAFT: I really don't have anything to add with respect to the agreement that was made and the sentence that the parties agreed that the Court would impose if the Court accepted the plea agreement, which the Court did.

I do have -- I want to say I do have the letter from

Grant Quale, who's the brother of Michael Quale. It was included in the presentence report. He requested that I read it out loud in court, and I'd ask permission to do that.

THE COURT: Certainly.

MS. KRAFT: The letter reads as follows:

Ladies and Gentlemen, Officers of the Court, Your Honor, on September 25th, 1984, a tragedy took place. Two men died needlessly. One of these men, Michael Quale, was my brother. It was a selfless act of murder precipitated by the Outlaws motorcycle club.

On that day, my brother came to Lancaster Speedway --

You know what, I don't -- I don't know if I have the final letter because there was a comment in here about his brother.

Do you -- let me just finish, though.

On that day, my brother came to the Lancaster Speedway looking for peace. When it was over, he and Walter Posnjak were dead.

Let me start over.

Your Honor, Officers of the Court, Ladies and Gentlemen, on September 25th, 1994, a tragedy took place. Two men died needlessly. One of these men, Michael Quale, was my brother. His death was a selfish act of murder perpetrated by members of the Outlaws motorcycle club.

On that day, my brother came to the Lancaster Speedway

in peace. When it was over, he and Walter Posnjak were dead. This didn't have to happen. Events preceding the brawl were warnings to police and Speedway security that were ignored; and in the end, aggression prevailed and blood was shed.

In the following years, men were tried and convicted of taking part in this horrific event. You, Mr. Yager, are the last of the men charged with my brother's death.

Although you have taken a plea, I don't believe that you have admitted your role in my brother's murder; but you bear the guilt and must bear the responsibility.

Your actions were far more reaching than you know. As a result of those actions, my brother's two sons, Max and Jessie, grew up without the love and support of their father. It is a void in their lives that can never be filled.

My family is not happy with the plea agreement reached by the parties involved; but as a wise man said, sometimes you must compromise even if you are right.

You, Mr. Yager, deserve a stiffer penalty. I hope the time you spent running and the time you will spend in prison make you reflect on the harm that you have caused and make you remorseful for what you have done.

Thank you, Grant W. Quale and the family of Michael James Quale.

I'm sorry when I started out that I had read -- he sent me two drafts; he added some things after.

THE COURT: Certainly.

The Probation Department did forward the letter to the Court, so I've read it.

MS. KRAFT: Thank you, Your Honor.

I want to say that we also reached out to Joan Byas, Don Fogg's mother, and she has not responded with any comments she wanted to make to the Court. And we reached out to, I believe, Jack Castle's family; and they also have not responded with any comments that they wish to make to the Court.

And as reflected in the presentence report, both the Fiebrantzes and Michael Coyne have declined to comment; so that's where we are in terms of the victim impact on this.

THE COURT: All right. Thank you.

Anything further you'd like to add, Mr. Hurley?

MR. HURLEY: I'm sorry, did you say me, Your Honor?

THE COURT: Yes.

MR. HURLEY: No, sir.

THE COURT: Earlier I had my staff circulate to counsel and Mr. Yager a series of conditions of supervised release.

Mr. Hurley, have you had a chance to review those with your client?

MR. HURLEY: I haven't yet, Your Honor.

THE COURT: Do you want to take a few minutes to do so?

MR. HURLEY: If I may.

THE COURT: All right. We'll stand in recess.

(A recess was taken from 8:48 a.m. to 8:55 a.m.)

THE COURT: Let the record reflect that we've reconvened in the sentencing of Mr. Yager.

As the Court noted with respect to the guideline computations, the guidelines even as the Court has found them to apply with a total offense level of 40 still would suggest a life term of imprisonment.

As the Court noted in its colloquy with counsel and Mr. Yager at the time the subject of an agreed sentence was broached, this case has had a long, long history.

And the fact of the matter remains that given Mr. Yager's health, his age, and the cost of a yet another prosecution against the backdrop of the cost of incarceration, more than recommended to Judge Stadtmueller that an agreed sentence of 15 years for a man soon to be 60 years of age would be more than sufficient as against the backdrop of his having been out of the country in a situation that was far from ideal, particularly when it came to medical needs.

And so the Court, against the backdrop of having tried others on two separate occasions, sentenced all of those defendants and reviewed the more than 15,000 pages of testimony from the earlier trials, commended that the reasoned resolution agreed upon between Mr. Yager, his attorney Mr. Hurley and

Government counsel, Ms. Kraft, Ms. Kwaterski and Mr. Campbell, would, absent other compelling factors, be agreed to by the Court.

And after reviewing the presentence report that Mr. Dragolovich prepared, the Court continues in its finding that the agreed-upon sentence was more than fair, just, and reasonable and sufficient to meet the goals of sentencing.

That only leaves the matter of an appropriate term of supervised release. The Court earlier circulated a series of 11 conditions.

Mr. Hurley, do you and your client have any issue with any of them?

MR. HURLEY: No, Your Honor.

THE COURT: Thank you.

Ms. Kraft and Ms. Kwaterski, does the Government have any problem with any of the 11 conditions?

MS. KRAFT: We do not. They're fine, Your Honor.

THE COURT: Thank you.

That being the case then, for the reasons previously stated, this now becomes the formal sentence of the Court:

Randy Yager, back on May 24th of this year, you entered a plea of guilty and were adjudged guilty as to Count One of the Second Superseding Indictment charging you with participation in an enterprise engaged in racketeering activity in violation of Title 18 of U.S. Code Section 1962 and Count

Two of the same Second Superseding Indictment charging you with conspiracy to participate in an enterprise engaged in racketeering in violation of Title 18 of the U.S. Code Section 1962(d).

The Court now having asked the defendant why judgment should not now be pronounced and pursuant to the Sentencing Reform Act of 1984, together with the terms of the plea agreement the Court earlier discussed, it is the judgment of the Court that you, Randy Yager, be committed to the custody of the Bureau of Prisons to be imprisoned for a term of 180 months as to each of Counts One and Two of the Second Superseding Indictment to be served concurrent with one another for a total term of imprisonment of 180 months or 15 years.

The Court further determines that the defendant does not have the financial ability to pay any fine and, accordingly, waives any fine in his case.

Upon release from imprisonment, he shall be placed on supervised release for a term of five years as to each count of conviction to be served concurrently for a total term of five years of supervised release.

While on supervised release, the defendant shall comply with each of the 11 conditions that the Court earlier circulated to which no objection was made.

I note parenthetically that consistent with recent Seventh Circuit decisions, should there be a need for further

modification of the terms of supervised release at the time of Mr. Yager's release from the custodial portion of the Court's sentence, the time to take those up would be as part of Mr. Yager's pre-release planning.

In accordance with the Mandatory Victims Restitution Act of 1996 as provided for in 18 U.S.C. Section 3013, the defendant is ordered to pay a special assessment in the amount of $100 as to each count of conviction or a total special assessment of $200.

That special assessment is due and payable immediately at the office of the Clerk of the Court, which is located in Room 362 of this building.

Mr. Hurley, if you have any recommendation as to a place of confinement, I'll be happy to include it in the judgment and commitment order recognizing, of course, that it remains the prerogative of the Bureau of Prisons as to a place of confinement based upon their classification standards.

MR. HURLEY: I would ask the Court, if it would, to recommend Oxford, Wisconsin.

THE COURT: All right. I'll be happy to do so.

Having entered pleas of guilty to each of Counts One and Two of the Second Superseding Indictment, I now advise Mr. Yager that if he believes the guilty pleas he earlier entered were either involuntary or otherwise contrary to law or that the Court imposed a sentence in his case today that is contrary

to law, I now advise him of his right of appeal.

Should you elect to appeal, Mr. Yager, Mr. Hurley is obliged to file a notice of appeal on your behalf within 14 days of the docketing of the judgment and commitment order, otherwise you will have effectively waived any right of appeal. If you are unable to pay the cost of an appeal, you do have the right to seek relief to appeal in forma pauperis.

And, Mr. Hurley, as you are aware pursuant to the teachings of U.S. Supreme Court in *Roe versus Flores-Ortega* decided in February of 2000, you have an obligation to confer with Mr. Yager as to the merit of any appeal and be guided by any request that he may make of you in that regard.

In the event he elects to forgo an appeal, I would invite you as his counsel to formally notify the Court whether by pleading or letter indicating that you have discussed with Mr. Yager his right of appeal and that he has elected to forgo an appeal.

Are there any additional matters that we need address, Counsel?

MS. KRAFT: There's one thing, and this really isn't -- it doesn't relate to the sentencing per se; but I do, I guess, want to bring it up.

Because there are several people in the courtroom, I don't know what their affiliation to Mr. Yager is.

Agent DeValkenaere has received some information from

some sources that there were certain members of the Joliet Outlaws who are waiting for Mr. Yager's sentencing before undertaking some type of retaliation against Ronald Talmadge, a former Outlaw who is expected to testify against Mr. Yager.

I don't have any belief that Mr. Yager was involved in any way in discussions about this, but I want -- I just want to say publicly that agents are watching, are trying to protect Mr. Talmadge, and are watching things in Joliet.

And so if there are any plans to do something like that, I think that anyone who's in the courtroom who might be in touch with those people who have those plans are on notice that they should do what they can to make sure that nothing happens.

And I believe that if Mr. Yager is contacted about this, he has the ability to squash anything like that because he clearly still engenders a lot of loyalty by members of the Outlaws.

Again, I am not saying that Mr. Yager is in any way responsible for the rumors that that is going to happen, but I just want to alert everybody to the fact that we are conscious of our need to be protective of people who are part of the criminal justice process, and I know that everybody respects that.

THE COURT: All right. Thank you.

Anything further, Mr. Hurley?

MR. HURLEY:  No, Your Honor.

THE COURT:  Very well.

The Court stands in recess until 9:30.

(Proceedings concluded at 9:05 a.m.)

STATE OF WISCONSIN )
) SS:
MILWAUKEE COUNTY )

I, SHERYL L. STAWSKI, a Registered Professional Reporter and Official Court Reporter, for the United States District Court, Eastern District of Wisconsin, do hereby certify that the above proceedings were reported by me on the 26th day of July, 2016, and reduced to writing under my personal direction and is a true, correct and complete transcription of my computer-aided transcription of my stenographic notes.

Dated at Milwaukee, Wisconsin, this 7th day of July, 2022.

s/ Sheryl L. Stawski

Sheryl L. Stawski
Official Court Reporter
United States District Court